

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-18-1999

# USA v. Hernandez

Precedential or Non-Precedential:

Docket 98-5266

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"USA v. Hernandez" (1999). *1999 Decisions.* Paper 135.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/135

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 17, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-5266

UNITED STATES OF AMERICA

v.

JULIO HERNANDEZ,

        Appellant

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 97-cr-00362-2)
District Judge: Honorable Anne E. Thompson

Argued: January 25, 1999

Before: SLOVITER, McKEE and RENDELL, Circuit Judges

(Filed May 17, 1999)

        Lisa Van Hoeck, Esq. (Argued)
        Office of Federal Public Defender
        22 South Clinton Avenue
        Station Plaza #4, 4th Floor
        Trenton, NJ 08609

         Attorney for Appellant

        George S. Leone, Esq.
        Allan Tananbaum, Esq. (Argued)
        Office of United States Attorney
        970 Broad Street
        Room 700 Newark, NJ 07102

         Attorneys for Appellee

OPINION OF THE COURT

McKEE, Circuit Judge.

Julio Hernandez appeals his conviction for conspiring to obstruct interstate commerce by robbery in violation of 18 U.S.C. SS 1951 (a) and 2, and receiving or possessing goods stolen from commerce in violation of 18 U.S.C. S 659. He argues that the District Court erred in defining reasonable doubt to the jury, in sustaining objections to certain oral statements which defense counsel sought to admit into evidence, and in allowing jurors to ask questions of witnesses. Because we agree that the District Court's definition of reasonable doubt was likely to cause confusion, we will reverse and remand for a new trial.

I.

This case arises from the highjacking of a tractor trailer truck containing 494 cases of cigarettes valued at $335,125.00. On the morning of Friday, June 13, 1997, Jose Sanchez was delivering the shipment of cigarettes when a van cut him off and forced him to stop his truck. Washington Alvarez jumped out of the van waiving a gun and ordered Sanchez to roll down the window and get out of the truck. Sanchez complied with the demand, but only after he pressed a panic button inside the truck that was designed to silently signal an alarm.

As Sanchez was forced from his truck, another individual, later identified as Julio Hernandez, got in. Alvarez lead Sanchez to a nearby van and forced him to get in. When Sanchez got inside, Alvarez placed duct tape over his eyes and taped his hands together. After Alvarez finished binding Sanchez, a third individual named Luis got out of a second van and joined the confederate who had gotten into Sanchez' truck. The conspirators then drove off with Sanchez' truck and its cargo, and Alvarez drove off with Sanchez. Sanchez was eventually released, and sought help from a police officer who lived nearby. Alvarez was arrested a short time later.

2

Meanwhile, a satellite tracking device inside the stolen truck disclosed the truck's location to police. As the truck was backed into a docking space at a gas station, the police arrived, secured the scene, and questioned onlookers about the whereabouts of the driver. A garage at the gas station had been converted to a warehouse, and after the police conducted their investigation they arrested Hernandez who had been unloading cases of cigarettes from the truck and placing them inside the warehouse. Police searched Hernandez pursuant to that arrest and found Sanchez' cigarette lighter inside a package of cigarettes that was inside Hernandez' shirt pocket. Hernandez later gave a statement in which he explained that he had borrowed a cigarette from men who had offered him a job unloading the truck. He explained that he never returned the cigarettes because the men left when the police arrived.[1] According to Hernandez, the lighter was inside the pack of cigarettes when he got it.

Hernandez stood trial on charges of conspiring to obstruct commerce in violation of 18 U.S.C. S 1951(a) (count 1), obstructing commerce by robbery in violation of 18 U.S.C. SS 1951(a) and 2 (count 2); and receiving and possessing goods that had been stolen from interstate commerce in violation of 18 U.S.C. SS 659 and 2 (count 3).

Alvarez testified against Hernandez pursuant to a plea bargain. He testified that Hernandez had jumped into Sanchez' truck after Sanchez was forced out of it, and that Hernandez then drove it away with Luis, and one other conspirator. Hernandez' trial lasted only four days, but the jury deliberated for three days without reaching a verdict. Finally, on the third day, after the trial judge gave a modified Allen charge, the jury convicted Hernandez on counts 1 and 3, but acquitted him of the charges in count 2 of the indictment. This appeal followed.

II.

We turn first to Hernandez' challenge to the District

---

1. Police did briefly detain two men, but allowed them to walk away after brief questioning.

Court's practice of allowing jurors to participate in questioning witnesses during the course of the trial. The District Court allowed jurors to pose questions by handing the court written questions for the court's review. It appears from this record (and appellant does not argue to the contrary) that the court would then allow the attorneys to see the question so that counsel could make whatever objections they deemed appropriate, and the court could thus determine the admissibility and propriety of a question outside the hearing of the jury before asking the question.

One juror did submit a question in this manner. The juror asked: "[w]hat kind of rear doors are on the rear of the trailer?" App. at 644. However, the court did not ask the question of the witness. Rather, the court allowed the attorneys to decide what, if any, response each would make to the question. The court then gave the following explanation to the jury:

> Let me just say with regard to questions that are presented by a witness, -- by a juror, it well may be a particular witness who is on the stand at the time may not be the person to whom such a question would be addressed because he may not be a witness who may be in a position to answer the question.
>
> We appreciate having your questions because now the attorneys on both sides know what inquiries you would make and either they may address them through their closing arguments, or they know if they wish to bring any additional witnesses to address the question, that would be up to them.

App. at 644-45. Defense counsel immediately objected to the question, even though the court never asked it. When court reconvened the following day, defense counsel reiterated her objection, and requested that the court conduct voir dire of the juror who had submitted the question. Defense counsel argued that the substance of the question, as well as its timing, suggested that the juror assumed Hernandez was guilty. The court denied the request stating:

4

> That . . . is an unreasonable request because there is nothing to suggest the juror had any notions of guilt. It merely reveals a juror had a question about the truck and what the truck was like. This was a fact question. There was nothing in the way the question was worded which suggested guilt, innocence, anything other than was the light red or was the light green? It was purely a fact question.
>
> I think it was handled appropriately.

App. at 675-76. Defense counsel now insists that

> [b]y permitting the jurors to act as inquisitors and declining to investigate alleged jury misconduct following the suspect question, the court denied Hernandez his Sixth Amendment right to a fair trial before an impartial jury. Juror questioning of witnesses is a "procedure fraught with perils. In most cases, the game will not be worth the candle." United States v. Sutton, 970 F.2d 1001, 1005 (1st Cir. 1992).

Appellant's Br. at 37. However, there is nothing here to suggest "jury misconduct" other than the unsupported inference that the juror who posed the question had reached a decision about the defendant's guilt before the end of the trial. Although defense counsel's argument urges such an assumption upon us, we refuse to jump to that conclusion. There is nothing in this record to suggest that the juror who posed the question was motivated by anything other than a desire to know about the rear doors on the highjacked truck. We will not violate the sanctity of the jury by requiring a judge to probe into the motivation behind such an innocuous question.

Defendant's more general challenge to the propriety of allowing juror questioning is an issue of first impression in this circuit, and requires more discussion. Although we have not previously addressed this issue, several other courts of appeal have. Although those courts have consistently expressed concern over the dangers of the practice, they have refused to adopt a rule prohibiting juror questioning of witnesses during the course of a criminal trial. See United States v. Bush, 47 F.3d 511 (2d Cir. 1995); United States v. Ajmal, 67 F.3d 12, 14 (2d Cir. 1995);

5

United States v. Cassiere, 4 F.3d 1006, 1017–18 (1st Cir. 1993); United States v. George, 986 F.2d 1176, 1178 (8th Cir. 1993); DeBenedetto v. Goodyear Tire & Rubber Co., 754 F.2d 512, 516 (4th Cir. 1985); United States v. Callahan, 588 F.2d 1078, 1086 (5th Cir. 1979); United States v. Gonzales, 424 F.2d 1055, 1055 (9th Cir. 1970). We take this opportunity to approve of the practice so long as it is done in a manner that insures the fairness of the proceedings, the primacy of the court's stewardship, and the rights of the accused.[2]

In United States v. Polowichak, 783 F.2d 410 (4th Cir. 1986), the court disapproved the practice of posing juror questions in front of other jurors. The court stated that the trial judge should require questions to be submitted in writing, without disclosure to other jurors, "whereupon the court may pose the question in its original or restated form upon ruling the question or the substance of the question proper." Id. at 413.

In United States v. Stierwalt, 16 F.3d 282 (8th Cir. 1994), the court held that the District Court did not err where questions were submitted in writing and all evidentiary issues were resolved before the judge read the questions to the witness. See id. at 286. See also George, 986 F.2d at 1178–79 (holding that despite the fact that the jury submitted 65 written questions to the court, the court employed proper formal procedures in that the questions were discussed with the attorneys and ruled upon by the judge).

In United States v. Bush, supra, jurors directly questioned witnesses, including the defendant. Defense counsel failed to object, and even engaged in a dialogue with the jurors.[3] The practice of allowing such questioning

_____

2. Our discussion is in the context of this criminal trial. We note, however, that properly structured juror questioning in a civil trial poses even fewer of the risks than we are concerned with here. Moreover, allowing jurors in both civil and criminal trials to pose questions for the
court's consideration is consistent with modern concepts of trial practice.
See Verdict: Assessing the Civil Jury System Robert E. Litan ed. (1993).

3. After the defendant had answered one of the questions asked by a juror, defense counsel asked the juror: "does that answer your question sir?" 47 F.3d at 512.

6

was therefore reviewed for plain error. The court first noted that "[w]e have already held . . . that direct questioning by jurors is a `matter within the judge's discretion, like witness-questioning by the judge himself.' " Id. at 514. The court noted that "[e]very circuit court that has addressed this issue agrees. State courts, moreover, have overwhelmingly placed juror questioning of witnesses within the trial judge's discretion, and indeed its common law roots are deeply entrenched." Id. at 515 (citations omitted). Nevertheless, the court expressed concern over this practice. "Although we reaffirm our earlier holding . . . that juror questioning of witnesses lies within the trial judge's discretion, we strongly discourage its use." Id. The court listed several dangers endemic to the practice including "turning jurors into advocates, compromising their neutrality," the "risk that jurors will ask prejudicial or otherwise improper questions," and counsel's inability to respond for fear of antagonizing, alienating, or embarrassing a juror. Id. The court noted that

> [b]alancing the risk that a juror's question may be prejudicial against the benefit of issue-clarification will almost always lead trial courts to disallow juror questioning, in the absence of extraordinary or compelling circumstances.

Id. at 516. However, the court affirmed the conviction because the challenged questioning had been "limited and controlled" and because the defendant could not demonstrate prejudice. Id.

In United States v. Sutton, 970 F.2d 1001 (1st Cir. 1992), the court voiced similar concerns about allowing jurors to question witnesses even though the procedure used involved the court asking questions that the jurors had submitted in writing. Id. at 1005. Once again, the court allowed the practice though it was clearly troubled by it. "Although we think this practice may frequently court unnecessary trouble, we find no error in the circumstances of this case." Id. at 1003. There, at the beginning of the trial, the trial court had informed the jurors that they could ask questions by handing written questions to the jury foreman who would then give them to the judge. "If your question even possibly could make any legal difference . . .

7

if it's relevant as the lawyers say, I'll ask it for you." Id. On appeal, the court stated:

> Allowing jurors to pose questions during a criminal trial is a procedure fraught with perils. In most cases, the game will not be worth the candle. Nevertheless, we are fully committed to the principle that trial judges should be given wide latitude to manage trials. We are, moreover, supportive of reasoned efforts by the trial bench to improve the truth seeking attributes of the jury system. Consistent with this overall approach, and mindful that the practice . . . may occasionally be advantageous, especially in complex cases and under carefully controlled conditions, we hold that allowing juror-inspired questions in a criminal case is not prejudicial per se, but is a matter committed to the sound discretion of the trial court.

Id. at 1005. Although the court allowed the practice, it was quick to discourage it. "We hasten to add that the practice, while not forbidden, should be employed sparingly and with great circumspection." Id. The court also added to the list of concerns enunciated in Bush, though it acknowledged that the practice could further the search for truth by allowing jurors to clear up confusion. The court also recognized that allowing jurors to participate in questioning could enhance the attentiveness of jurors. Nevertheless, the court concluded "in most situations, the risks inherent in the practice will outweigh its utility." Id.

In United States v. Ajmal, supra, the court did reverse a conviction based upon juror questioning of witnesses, even though the judge had "incorporated prophylactic procedures to lessen the potential prejudice. . . ." 67 F.3d at 15. The Second Circuit noted that the trial judge's decision to invite such questioning

> was not necessitated by the factual intricacies of this banal drug conspiracy, nor . . . prompted by the urging of jurors themselves. Rather, the District Court, as a matter of course, established at the outset of the trial that jurors would be allowed to question witnesses. Indeed, the District Court encouraged juror questioning throughout the trial by asking the jurors at the end of

8

> each witness's testimony if they had any queries to pose. Not surprisingly, the jurors took extensive advantage of this opportunity to question witnesses, including Ajmal himself.

Id. at 14 (emphasis added). The trial judge there had taken precautions. He had required questions to be in writing, and the court, rather than the attorneys, asked the questions. In addition, the court only asked those questions that it believed were proper under the Federal Rules of Evidence. Nevertheless, the Court of Appeals held that the trial judge had abused his discretion.

> Although the District Court substantially complied with the procedures this Court advocated in Bush,. . . such measures alone cannot purge the harm caused by the extensive juror questioning in the case at hand. Regardless of the procedures adopted by the District Court to vet questions, there must be ample justification for adopting the disfavored practice in the first instance. To hold otherwise would sanction juror questioning of witnesses in any circumstance, so long as appropriate prophylactic measures are adopted. We cannot accept such a proposition.

> In light of our discussion above, the District Court's encouragement of juror questioning of witnesses . . . was an abuse of discretion.

67 F.3d at 15 (emphasis added). Thus, although the court was once again concerned with the practice of allowing juror questioning absent circumstances sufficient to justify the risk inherent in the procedure, the court clearly based its reversal upon the trial court's encouragement of such questioning, and the frequency with which jurors had accepted the judge's invitation.

Here, the court received only one question from the jury. It was a fact question that was not even asked. We do not think that one fact question which is submitted to a judge in writing, but not even asked, can be labeled an abuse of discretion. See United States v. Lewin, 900 F.2d 145 (8th Cir. 1990). In Lewin, jury questioning was deemed proper where the jury tendered six questions to the court and the court only asked four of them. The questions that the court

9

allowed were "specific and factual in nature," and no questions were asked of the defendant. Id. at 147–48. The court of appeals noted that "this [was] not a case in which juror questioning was allowed to become disruptive or abusive." Id. Moreover, the court suggested appropriate safeguards. "[I]f [the District Court] decides to permit jurors to ask questions in future trials, it should consider requiring jurors to submit their questions in writing, or orally out of the presence of the other jurors, without prior discussion with the other jurors." Id. at 148.

We agree that a trial judge who allows such questioning in a given case should adopt a procedure to first screen the questions. However, we conclude that the dangers of allowing jurors to ask questions orally far outweighs any perceived benefit of allowing juror questioning of witnesses. Thus, the judge should ask any juror-generated questions, and he or she should do so only after allowing attorneys to raise any objection out of the hearing of the jury.

The procedure utilized here is consistent with our admonitions and consistent with the sound exercise of judicial discretion. The court did not surrender its discretion as to whether to allow a given question to be asked, and the judge, not the attorneys (and certainly not the jurors), was to have asked any questions posed by a juror. This procedure is consistent with the holding of every court of appeals that has addressed this issue. We hold that the trial judge did not abuse her discretion.

III.

At trial, defense counsel attempted to have a witness testify that when police approached Hernandez at the gas station, Hernandez told them that "he was there unloading a truck and expected to be paid for his labor." Appellant's Br. at 18. The District Court ruled that the statement was inadmissible hearsay. Hernandez argues that this statement should have been admitted under the state of mind exception contained in Federal Rule of Evidence 803(3). We afford the District Court's evidentiary rulings plenary review insofar as the court was interpreting a rule of evidence. However, we review the court's rulings on

10

admissibility for abuse of discretion. See United States v. Donley, 878 F.2d 735, 737 (3d Cir. 1989).

Federal Rule of Evidence 803(3) states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . .
>
> (3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

The state of mind exception is usually traced to the Supreme Court's holding in Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285 (1892). There, the Supreme Court held that letters in which a missing person expressed an intent to travel to Crooked Creek could be introduced to help establish the identity of an unidentified body later found there. The Court reasoned that "[t]he existence of a particular intention in a certain person at a certain time being a material fact to be proved, evidence that he expressed that intention at that time is as direct evidence of the fact as his own testimony that he then had that intention would be." Id. at 295. Thus, while the letters were not proof that the deceased actually went to Crooked Creek, they tended to show that at least prior to his death, he intended to. Id. at 295-96.

The rule is now firmly established that "[t]here are times when a state of mind, if relevant, may be proved by contemporaneous declarations of feeling or intent." Shepard v. United States, 290 U.S. 96, 104 (1933). However, the scope of this exception must be limited to prevent it from devouring the rule. Thus "[s]tatements that are considered under . . . the `state of mind' exception, cannot be offered to prove the truth of the underlying facts asserted." Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc. , 63 F.3d 1267, 1274 (3d Cir. 1995). See also Blackburn v. Aetna

11

Freight Lines, Inc., 368 F.2d 345, 348 (3d Cir. 1966), (holding "[i]t is too well settled to require discussion that a declaration of a state of mind or intention is admissible to prove that the declarant actually had such intention.").

Thus, in United States v. Palma-Ruedas, 121 F.3d 841 (3rd Cir 1996), we affirmed the District Court's exclusion of testimony that a witness named Hernandez had said,"nice to meet" you when introduced to a person named Avenando. The proponent wanted to use the statement as evidence that the two had not previously met. We concluded that use of the statement was improper because "statements offered to support an implied assertion are inadmissible hearsay." Id. at 857 (citing United States v. Reynolds, 715 F.2d 99, 104 (3rd Cir. 1983)). Here, Hernandez' statement that he had just arrived and expected to be paid was only relevant because of the implied assertion that he was not involved in the highjacking.

Appellant relies on United States v. DiMaria, 727 F.2d 265 (2d Cir. 1984), to support his argument that the state of mind exception applies. In DiMaria, the defendant was prosecuted for his involvement in stealing cigarettes. His defense was that he thought that no tax had been paid on the cigarettes ("bootleg cigarettes"), but that he did not know they were stolen. In support of that position, defense counsel attempted to introduce evidence that the defendant told FBI agents arriving on the scene: "I thought you guys were just investigating white collar crime; what are you doing here? I only came here to get some cigarettes real cheap." Id. at 270. The District Court excluded that statement ruling that it was inadmissible hearsay. The Court of Appeals for the Second Circuit reversed. That court held that the defendant's comment "stated, or so the jury could find, that his existing state of mind was to possess bootleg cigarettes, not stolen cigarettes. It was not offered to prove that the cigarettes were not stolen cigarettes but only to show that DiMaria did not think they were. . . . It was a statement of what he was thinking in the present." Id. at 271. The court also recognized that the Federal Rules of Evidence opted for the view that"the self-serving nature of such a declaration went only to its weight." Id. The court reasoned that"[t]here is a peculiarly

12

strong case for admitting statements like DiMaria's, however suspect, when the Government is relying on the presumption of guilty knowledge arising from a defendant's possession of the fruits of a crime recently after its commission." Id. at 272.

DiMaria is distinguishable from the instant case. Here, Hernandez' statement that he was unloading a truck is not evidence of his state of mind. Rather, it is his out of court statement of why he was at the gas station, and what he was doing there. Accordingly, it does not fall within Rule 803(3), or any other exception to the general prohibition against hearsay evidence. Although his statement that he expected to be paid arguably falls within DiMaria's interpretation of Rule 803(3), we believe it is only relevant because of the implicit assertion that Hernandez was a laborer, and not involved in a highjacking. Accordingly, the District Court properly excluded it as required by Palma-Ruedas. To the extent that DiMaria would require a different result, we are clearly bound by our own precedent, as was the District Court.

IV.

Hernandez also alleges that the District Court's definition of "reasonable doubt" violated his Fifth Amendment right to due process and his Sixth Amendment right to a jury trial. "In reviewing whether a District Court in its charge to the jury correctly stated the appropriate legal standard, our review is plenary." United States v. Johnstone, 107 F.3d 200, 204 (3d Cir. 1997). Jury instructions, taken as a whole, must "clearly articulate the relevant legal standards" and "avoid confusing and misleading the jury." Id. at 204. When an attack upon a jury charge is based upon the trial court's instruction on reasonable doubt, "[t]he constitutional question . . . is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the [constitutional] standard." Victor v. Nebraska, 511 U.S. 1, 6 (1994). Such a reasonable likelihood exists here.

It is axiomatic that "[t]he Due Process Clause requires the government to prove a criminal defendant's guilt beyond a

13

reasonable doubt," therefore, "trial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires." Id. at 22. Nonetheless, District Courts are not required to define "reasonable doubt" as a matter of course. Id. at 5. Moreover, when a trial judge does define the term, no "particular form of words" is required. Id. The law requires only that the concept be correctly conveyed to the jury when it is defined. Id. (citing Holland v. United States, 348 U.S. 121, 140 (1954)).

Reasonable doubt is not an easy concept to understand, and it is all the more difficult to explain. Moreover, given the concerns about crime that are so prevalent in today's society, common sense suggests that it is particularly difficult for lay jurors to understand that they must acquit a criminal defendant if the prosecution does not establish guilt beyond a reasonable doubt, even if they feel that the defendant is probably guilty. Jurors may well be reluctant to free someone accused of a serious and violent crime "merely" because the government didn't prove beyond a reasonable doubt what they feel "in their hearts" is probably true. Yet, due process is satisfied by nothing less than a juror's understanding that he or she may not vote to convict a defendant based upon a belief "that the defendant is probably guilty. . . ." Sullivan v. Louisiana, 508 U.S. 275, 278 (1993) (emphasis added). Rather, an impartial evaluation of evidence is required. "A juror is impartial if he or she can lay aside any previously formed `impression or opinion as to the merits of the case' and can `render a verdict based on the evidence presented in court.' " United States v. Polan, 970 F.2d 1280, 1284 (3d Cir. 1992). Reasonable doubt is, therefore, a doubt based upon reason rather than whim, possibilities or supposition. Id. at 1286.

Here, the District Court commented upon proof at different points during the trial. The court first commented upon reasonable doubt during the course of jury selection. The court informed potential jurors:

> [THE COURT]: Now, ladies and gentlemen, a criminal case comes before you by way of indictment and the Government has to prove the elements of the offense,

14

each offense in the indictment beyond a reasonable doubt, each count has to be proven beyond a reasonable doubt.

And if the Government fails to prove to your satisfaction each and every element of each count, then you would return a verdict of not guilty. If the Government does prove a count beyond a reasonable doubt, including each and every element, then you would return a verdict of guilty.

You are to be thoughtful, systematic, analytical, impartial, unbiased. . . .

Under our system of justice, the Government carries the burden of proof in a criminal case. The Government brings the charge. The Government has to prove the charge. . . .

How do you decide if they have been proven? There is no scale we can say all right, this is how you can weigh the evidence. It's really an internal process that you must engage in. You have to use your judgment, your maturity, your powers of analysis, your sense of what makes -- what sounds reasonable, what sound [sic] likely. Does this sound like what happened or does that sound like I can't believe that's what happened? You have to decide that.

App. at 121–22 (the "voir dire instructions"). 4

After the jury was empaneled, but before the jury began hearing evidence, the court told the jury:

The burden of proof is on the Government. The Government brings the charges. The Government has to prove the charges. The grand jury has been impaneled by the Government. The defendant doesn't appear before the grand jury. The grand jury hears the evidence and decides whether an indictment shall issue, and you are the body to decide whether the charges are to be sustained.

_____

4. For clarity, we will separately characterize each of the portions of the
District Court's comments to the jury that are relevant to this appeal.

15

How do you decide that? By whether the Government can prove the guilt of the charges of this defendant beyond a reasonable doubt. That's the standard.

How do you decide what is proof beyond a reasonable doubt? There is no specific definition. I'm sorry to tell you, but there are none. It's what you in your own heart and your own soul and your own spirit and your own judgment determine is proof beyond a reasonable doubt.

I'll give you some definitions at the end of the trial when I give the Judge's charge to the jury, but don't expect it to be the kind of ruler or measuring rod that you are going to be able to say: Uh-huh, now, I know what proof beyond a reasonable doubt means. It's what you feel inside as you listen to the evidence, and so that's why you really have to pay attention from the very beginning.

I'm going to have each witness put his or her name up on the easel there so you can just see that. That kind of helps you to focus. The government will call its witnesses first because that's the way a case proceeds. Each witness is called by the Government, questioned by counsel for the Government, cross-examined by the defense lawyer, counsel for the defense, and then, one by one, they come in and go out.

Then the Government rests at the end of its presentation of witnesses.

Then the defendant has an opportunity to present any witnesses he wants to present. He doesn't have to. He is free to present anybody he wants.

Then both sides rest.

Then the lawyers on each side give what we call a closing argument. They summarize what has been presented in the trial and the Judge gives the Judge's charge to the jury. When I do that, I'll give you something written so you can read along with me. That's when I'll define proof beyond a reasonable doubt. I'll define the presumption of innocence, what

16

does that mean. I'll define robbery. I'll define the various terms that you will hear throughout the trial.

App. at 175-76 (emphasis added) (the "initial instruction"). Defense counsel objected, and the court responded in an effort to impress upon the jurors the importance of the reasonable doubt concept. The court stated:

I don't want you to think that it is so ephemeral that it's meaningless or so subjective that it's an unworthy concept. It is a very important concept. It's indeed the backbone of the criminal law that proof must be convincing to a jury as to the guilt of a defendant beyond a reasonable doubt. And you will have to analyze the proofs so as to decide in your own mind: Was this proven beyond a reasonable doubt?

App. at 13 (the "clarification").

At the end of the trial the District Court gave what defendant refers to as a "traditional charge" on reasonable doubt. There, the court explained:

Under our system, the judge is the final arbiter of all questions of law and the jury in its deliberations must follow the law as given to it by the judge. It is the judge's function to instruct you in the law.

You are not to be concerned with the wisdom of any rule of law. . . .

***

Each phase of the instructions is to be considered and applied together with all other parts and phases of the instructions. You must not pick out some particular instruction alone or some particular portion of an instruction and overemphasize it and apply it without considering and keeping in mind all the other instructions given you with regard to this case.

You should construe each of the instructions in light of and in harmony with the other instructions. You should apply the instructions as a whole to the evidence. The order in which the instructions are given has no significance and is no indication of their relative importance. . . .

17

***

A defendant is never to be convicted on mere suspicion or conjecture. The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to a defendant for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witness or testifying himself or producing any evidence.

If after a fair, impartial and careful consideration of all the evidence, you have a reasonable doubt as to a defendant's guilt, it is your duty to acquit him. . . .

Now, what is reasonable doubt? Now, I'll try to define that. Reasonable doubt. A reasonable doubt is doubt based on reason and common sense. A reasonable doubt is such a doubt as would cause you to hesitate to act in matters of importance in your own lives. A reasonable doubt may arise from a lack of evidence. It is doubt based on reason, logic, common sense and experience. Reasonable doubt is not vague or hypothetical doubt. It is not speculative, imaginary qualms or misgivings. It is not just an excuse by a juror to avoid the performance of an unpleasant duty. It is not the normal sympathy which one human being may hold for another.

App. at 800-1 (the "traditional charge").

We first address Hernandez' assertion that portions of the voir dire instructions require a new trial. He argues that "[b]ased on the court's remarks, the jury may have believed incorrectly that a conviction could be based on what they felt in their hearts or what sounded likely." Appellant's Br. at 18. He asserts that "the court's sounds likely test reduced the constitutionally required standard of proof to a mere preponderance of the evidence."

However, the portion of the voir dire instructions that Hernandez challenges has nothing to do with reasonable doubt, nor do we think the jurors could have interpreted the comments to suggest a definition of that concept. Rather, the court was simply explaining how jurors go about determining if a witness is telling the truth. Its

18

comments amounted to nothing more than a suggestion that jurors ask themselves whether testimony has the proverbial "ring of truth," and we find no error in the court having done so. See Altmose Construction Co. v. NLRB, 514 F.2d 8, 15 n.8 (3d Cir. 1975) (noting the proverbial ring of truth in the noncriminal context); NLRB v. Nichols-Dover, Inc., 414 F.2d 561, 564 (3d Cir. 1969) (same). We reach a different result, however, with regard to the court's explanation of reasonable doubt.

Defendant acknowledges that the traditional charge was proper, but argues that the initial instruction stated an incorrect definition of reasonable doubt, and also suggested that the jury could ignore the correct definition in the traditional charge by warning jurors that the traditional definition would not be helpful.5 Appellant's Br. at 18. The government responds in part by arguing that the judge's initial instruction was meant merely to give an overview of the trial procedure. The government cites Guam v. Ignacio, 852 F.2d 459 (9th Cir. 1987), to argue that "[i]nstructions given at the start of a case simply do not have the same impact and therefore importance as instructions given to the jury at the close of a case, just before the case is submitted for the jury's deliberation." Appellee's Br. at 14. However, we believe that Ignacio, and the other cases relied upon by the government actually support Hernandez' argument.

In Ignacio, the trial court gave some general preliminary instructions that included instructions on reasonable doubt. The instruction that the court gave was, however, incomplete, and the Court of Appeals for the Ninth Circuit had previously ruled that the instruction "standing alone," was erroneous under Guam law. Ignacio, 852 F.2d at 461. However, the court's final charge "adequately cured the incomplete instruction. . . ." Id. Here, the initial instruction suggested that jurors could convict the defendant based upon what they believed in their own heart, soul and spirit

_____

5. "There is no specific definition. I'm sorry to tell you, but there are none. It's what you in your own heart and your own soul and your own spirit and your own judgment determine is proof beyond a reasonable doubt." App. at 175.

19

whether or not that belief was based upon a reasoned conclusion that the evidence established Hernandez' guilt beyond a reasonable doubt. Therefore, it was erroneous, not merely incomplete. The distinction is substantial. Subsequent amplification can fill the interstices in an incomplete explanation. However, when an erroneous instruction is given, a subsequent clarification must be sufficiently clear and compelling to allow a reviewing court to conclude that there was no reasonable likelihood that the initial inaccuracy affected the jury's deliberations. Victor, supra. Here, the government does not even maintain that the court's explanation that reasonable doubt is "what you feel inside" was correct. Rather, the government urges us either to ignore this language or to minimize its significance because of the subsequent clarification. In Ignacio, the court stated:

> [g]eneral orientation at the beginning of a trial should be cautiously worded, but it will not require reversal unless it produces prejudice or misleads the jury in a material way.

Id. at 461. Allowing a jury to determine reasonable doubt as to each element of a crime based upon what "you in your own heart and your own soul and your own spirit and your own judgment determine is proof beyond a reasonable doubt" clearly misleads the jury in a material way, to the prejudice of the defendant. It allows each juror to judge the evidence by a visceral standard unique to that juror rather than an objective heightened standard of proof applicable to each juror. It allows jurors to convict based upon their individual "gut feeling."

In Jackson v. Virginia, 443 U.S. 307 (1979), the Court stated

> The standard of proof beyond a reasonable doubt . . . plays a vital role in the American scheme of criminal procedure, because it operates to give concrete substance to the presumption of innocence to ensure against unjust convictions and to reduce the risk of factual error in a criminal proceeding. At the same time by impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the

20

accused, the standard symbolizes the significance that
our society attaches to the criminal sanction and thus
to liberty itself.

443 U.S. at 315 (emphasis added) (internal quotation
marks omitted).6 Thus, although a juror must subjectively
believe that a defendant has been proven guilty, that
subjective belief must be based upon a reasoned, objective
evaluation of the evidence, and a proper understanding of
the quantum of proof necessary to establish guilt to a "near
certitude." An instruction which allows a juror to convict
because of his or her subjective feelings about the
defendant's guilt, without more, is clearly inadequate. Here,
as Judge Sloviter quite correctly notes in her thoughtful
and forceful dissent, the District Court did tell the jury that
their verdict had to be based upon the evidence, and that
the government had the burden of proof. See dissent at 31.
However, a likelihood of confusion remained as to the
quantum of evidence necessary to sustain a conviction, and
the level of certainty that a juror had to have as to the
defendant's guilt, because the original explanation of
reasonable doubt may well have remained in the juror's
minds. Thus, a juror may well have concluded that a"gut
feeling" as to the defendant's guilt was adequate to convict
so long as that feeling was supported by a preponderance
of the evidence (or even less). The reasonable likelihood that
this may have happened is not mitigated merely because
jurors understood that the government had the burden of
proof. Francis v. Franklin, 471 U.S. 307, 322 (1985).
Moreover, the remaining cases that the government relies
upon are not to the contrary. See Appellee's Br. at 14.

In United States v. Hegwood, 977 F.2d 492 (9th Cir.
1992), defense counsel failed to object to the court's initial
definition of the crime of conspiracy. Id. at 495. The
definition that the court gave did not inform the jurors that
an intent to commit the substantive crime was an element
of the conspiracy. However, the court's final instructions
_____

6. In Jackson, the defendant was convicted in a bench trial. Thus, the
Court was not considering the effect of an erroneous reasonable doubt
standard on a lay jury. Nevertheless, as the dissent quite correctly
notes,
the language of Jackson is relevant to our discussion.

21

did inform the jury of that element. On appeal, the erroneous initial instruction was reviewed for plain error. The court relied upon Ignacio to hold that, absent exceptional circumstances, "[w]here the instruction challenged is given at the beginning of trial, reversal is unwarranted unless the defendant can prove prejudice or that the jury was materially misled." Id. The court then stated that no exceptional circumstances existed and it therefore would not assume that the jurors failed to follow the correct instruction. It was the only instruction they had on whether the government had to prove intent to commit the substantive offense. The court reasoned that

> [i]t stretches credulity to think that the jury disregarded the instruction they had just been given because it included an element that had not been mentioned earlier.

Id. (citing Franklin, 471 U.S. at 322)). The situation here is far more problematic than an inquiry into whether providing a missing element cured its earlier omission. Indeed, our situation is more akin to the problem in Franklin, supra. There, a defendant was charged with murder in connection with a fatal shooting that occurred after he had escaped from state custody. The defendant's sole defense was that the gun had accidentally discharged. The trial judge instructed the jury that one is presumed to intend the natural consequences of his or her actions, but that the presumption may be rebutted. The court also informed the jury that the defendant was presumed innocent, and that the prosecution had the burden of proving each element of the crime charged beyond a reasonable doubt.

Following his conviction, the defendant appealed alleging that the court's charge had improperly shifted the burden of proof to him, and that the language in the charge clarifying the burden of proof did not cure the infirmity. The Supreme Court agreed.

> A reasonable juror could easily have resolved the contradiction in the instruction by choosing to abide by the mandatory presumption and ignore the prohibition of presumption. Nothing in these specific sentences or

in the charges as a whole makes clear to the jury that one of these contradictory instructions carries more weight than the other. Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict.

Franklin, 471 U.S. at 322 (emphasis added). That is precisely our situation. Indeed, our situation is worse because in the initial instruction the District Court suggested that jurors would derive little guidance from the definition that would be given at the end of the trial. Jurors who may have been confused by the more abstract traditional charge may well have relied upon the court's earlier assessment of the definition, and adopted the more easily understood standard of what you feel "in your heart and soul" to determine if the defendant's guilt had been proven beyond a reasonable doubt.

The dissent believes that the initial instructions "were really comments rather than instructions . . . ," and concludes that they were not sufficient to create a reasonable likelihood of prejudice under Victor v. Nebraska, especially since they were immediately followed by a curative instruction. Dissent at 31. However, nothing in this record suggests that lay jurors drew this fine distinction, or that they were even aware of it. Moreover, the jury was never instructed to ignore the substantive portion of the court's initial instructions in determining the meaning of reasonable doubt. We do not suggest that the problems created by the initial instruction could not have been cured. Rather, we hold that the instructions taken as a whole (including the clarification) were not adequate to "unring" the bell. The clarification stressed the importance of the concept of reasonable doubt, and emphasized that it was not an "ephemeral" concept. However, it did not provide an accurate definition of the term, or instruct jurors to rely exclusively upon the written definition they would receive at the end of the trial. When the jurors finally heard the correct definition they had been forewarned that the definition they were hearing was less helpful than the prior erroneous explanation of what the term meant.

23

We are also unconvinced by the government's reliance upon United States v. Dilg, 700 F.2d 620 (9th Cir. 1981). See Appellee's Br. at 15-6. In Dilg, two juries were selected simultaneously. One was to hear Dilg's case, and the other was to be "on deck" to hear a trial that would start after Dilg's was finished. After both juries were selected, the judge gave general instructions that included instructions as to the presumption of innocence. Dilg's jury was then sworn, and the other jury was excused until later in the week.[7]

At the conclusion of Dilg's trial the court gave a formal charge that informed the jury of the government's burden of proving every element beyond a reasonable doubt, but did not mention the presumption of innocence. On appeal the defendant argued that this omission required a new trial. The prosecution countered that the jurors had been informed of the presumption of innocence in the court's general comments before trial and this cured the omission. The court of appeals disagreed.

> There was no indication that the preliminary instructions were intended as the sole source of any aspect of the law by which the case was to be decided. To make matters worse, at no time during the instructions given at the close of the trial did the judge refer back to the pre-trial instruction given on the presumption of innocence.

Dilg, 700 F.2d at 625. Here, it is clear that the initial instructions were not intended to be the "sole source" of the law the jury was to apply. Although the final charge did not "refer back to the court's preliminary comments," Appellee's Br. at 15, it did not have to. The seed had already been planted, and nothing in the final charge diminished the fertility of that seed.

The government urges us to adopt a rule giving thefinal charge more weight than instructions given during the course of the trial because it was given immediately before

_____

7. Because we find that the instructions given during voir dire were not erroneous we need not decide the effect of an erroneous instruction that is given before jurors are sworn.

deliberations, and the initial instructions were muted by the passage of time having been given earlier in the trial. See Appellee's Br. at 15. We refuse to adopt a rule that would judge the significance of a preliminary jury instruction by the length of the trial absent instructions from the trial court that would cause jurors to place more weight on the final charge than instructions given during the course of the trial. We will not assume that jurors, contrary to their oath, ignored part of the judge's initial instruction simply because it came early in the trial.[8] "The [law] presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." Franklin, 471 U.S. at 324. We will not now hold that the importance of a jury instruction is determined by its proximity to the end of the trial.

Similarly, we disagree with the dissent's assessment of the importance of "one sentence in an overview that covers eight pages." Dissent at 32. Clearly, one sentence can not be viewed out of context with the totality of the judge's instructions. Neither can that one sentence be ignored when viewing the eight pages of which it is a part. Thus, we can not agree that our holding is based upon "unfounded speculation that the jurors disregarded clear instructions." Dissent at 33 (citing United States v. Newby, F.3d 1143, 1147 (3d Cir. 1993).[9] Rather, this conviction can stand only if we engage in unfounded speculation that jurors followed the proper written instruction despite the court's statement that it was not going to help them. See Franklin, 471 U.S. at 322 ("[a] reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict."). Here, the jury was given two explanations of reasonable doubt. One was incorrect, and one was not. Due Process does not allow us to guess which

_____

8. Moreover, we note that this trial only lasted four days.

9. In Newby, the curative instruction as to improperly admitted evidence "was clear and effective," and the evidence in question was, "at most cumulative." Id. at 1146. Here, the curative instruction was neither clear nor effective, and the error requiring a curative instruction was far more serious.

25

definition the jurors adopted so long as there is a reasonable likelihood it chose the wrong one. Victor, 511 U.S. at 6. We hold only that, given the totality of the unique circumstances here, that reasonable likelihood exists.

The government's position to the contrary is rooted in the axiom that jury instructions must be viewed in their entirety, and a series of cases that have reaffirmed that principle. See United States v. Isaac, 134 F.3d 199 (3d Cir. 1998); United States v. Pine, 609 F.2d 106 (3d Cir. 1979); United States v. Smith, 468 F.2d 381 (3d Cir. 1972). Accordingly, the government relies upon Hegwood, to argue that "even assuming arguendo that the court's preliminary instructions were faulty, they were outweighed and indeed cured by the court's correct final charge." Appellee's Br. at 14. The government contends that the instructions, taken as a whole, adequately conveyed the concept of reasonable doubt and that there was, therefore, no reasonable likelihood that the jury understood the standard of conviction to be less than beyond a reasonable doubt.

However, as noted above, "[l]anguage that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity." Franklin, 471 U.S. at 322. Thus, although the soundness of the principle underlying the government's argument is beyond dispute, we do not think it cures the infirmity in the initial instruction. Accordingly, we conclude that there is a reasonable likelihood that jurors utilized an improper definition of reasonable doubt and convicted the defendant not because the government proved its case beyond a reasonable doubt as that term is properly understood, but because the jurors "felt" the defendant was guilty.10

_____

10. Our holding today is not intended to discourage the very common practice of providing jurors with preliminary remarks to assist them during the course of the trial. We only hold that when such preliminary instructions are given, jurors must not be allowed to guess at which of two conflicting instructions control their deliberations. This can be avoided by simply informing jurors which instructions control in the event they perceive a conflict between something they are told during the course of the trial, and something contained in the formal instructions that will follow the close of the evidence.

V.

For the reasons set forth above, the judgment of conviction will be reversed, and the matter will be remanded to the District Court for further proceedings consistent with this opinion.

27

RENDELL, Circuit Judge, Concurring:

I join in the thorough analysis, and result reached, by my colleague, but write briefly only to offer an additional practical reason as to why the purported cure by the District Court judge was not an adequate fix.

I have great faith in jurors, but think it asks too much to expect them to cast aside the court's initial instruction that reasonable doubt is incapable of definition and is based on what you feel inside, when later they are told its more analytic underpinnings. It strikes me as an exceedingly difficult if not impossible task.

If students of film were told before viewing afilm that there are no set rules for assessing a film and they should trust their heart and soul, then later, after viewing it, they are told to comment on it using a "reasoned" approach, will they not cling nonetheless to the impressions formed throughout the viewing based on their emotional reaction? I think we are naive if we think not.

Reasonable doubt is difficult enough without the confusion evident on this record. Can we trust that a juror who adheres to the judge's instruction and determines in her heart and soul that the defendant is probably guilty will be able to perform the mental gymnastics to replace all she has observed and felt with a reasoned weighing of the government's case (assuming she has made the effort to do so in the face of initial instructions that the later definition will be of little help)? I am dubious.

While it is true that a trial court's guidance as provided in most preliminary instructions will pale in significance as compared to the final dictates given, that is not the case if the particular instruction guides the jury's perceptions and observations as much as, or even more than, their ultimate decision making.

Further, I do not agree with our dissenting colleague that our holding that this particular miscue was not cured poses any threat to the concept of cure beyond the limits of this unique fact pattern.

28

SLOVITER, Circuit Judge, Dissenting:

I approve and join in Parts I, II and III of the majority's opinion. I dissent from Part IV because I do not agree that we should reverse a conviction when, as we all agree, the trial court gave the jury complete and accurate instructions on reasonable doubt before the jury deliberated. The majority overturns the conviction on the basis of language with which the District Court described reasonable doubt in preliminary comments made to the jury before they heard opening statements or evidence. However, in light of the majority's concession that there was no error in the instruction on reasonable doubt when it was included in the charge that was given to the jury four days later, immediately before the jury proceeded to deliberate, the effect of the majority's decision is to elevate those preliminary comments to incurable error. In my view, the majority's result is serious error, both because in the circumstances here the erroneous instructions, if any, were cured and because, as a general principle, incurable error is limited to grievous faults.

I.

The trial of Julio Hernandez began on February 4, 1998, on a three-count superseding indictment charging (count 1) conspiracy to obstruct, delay and affect commerce and the movement of commodities in commerce by robbery of a tractor-trailer and the contents thereof, in violation of 18 U.S.C. S 1951(a); (count 2) obstructing, delaying and affecting commerce and the movement of articles and commodities in commerce by robbery, and threatening physical violence to a person in furtherance of a plan to rob a tractor-trailer and its contents, in violation of 18 U.S.C. SS 1951(a) and 2; and (count 3) receiving and possessing with the intent to convert to his own use goods and chattel, namely 494 cases of cigarettes valued at over $250,000 that had been embezzled and stolen from a motortruck and were moving as part of an interstate shipment, in violation of 18 U.S.C. SS 659 and 2.

The jury received comments and/or instructions from the trial judge on reasonable doubt on three separate

occasions. The first occasion was on February 4 during what the majority characterizes as the "voir dire instruction." Hernandez contends that because the court stated in the course of those comments that the jurors would have to use their sense of "what sounds likely" in evaluating the evidence, he was entitled to a new trial. The majority rejects Hernandez's contention and concludes that there was no error in the remarks made by the District Court at that time.

The third occasion was the formal jury charge, given to the jury orally and in writing on February 13, before it proceeded to deliberate. The defendant does not challenge the instruction and the majority finds that charge to be without error. That instruction fully incorporates all of the relevant elements of a reasonable doubt charge, which the majority refers to as the "traditional charge" on reasonable doubt. In it, the District Court stated as follows:

> Now, what is reasonable doubt? Now, I'll try to define that. Reasonable doubt. A reasonable doubt is doubt based on reason and common sense. A reasonable doubt is such a doubt as would cause you to hesitate to act in matters of importance in your own lives. A reasonable doubt may arise from a lack of evidence. It is doubt based on reason, logic, common sense and experience. Reasonable doubt is not vague or hypothetical doubt. It is not speculative, imaginary qualms or misgivings. It is not just an excuse by a juror to avoid the performance of an unpleasant duty. It is not the normal sympathy which one human being may hold for another.

> It is not necessary for the United States or the Government to prove the guilt of a defendant to a mathematical certainty or beyond all possible doubt. The reason is in this world of ours, it is practically impossible for a person to be absolutely and completely convinced regarding any disputed fact which by its nature is not susceptible of mathematical certainty. Consequently, the law is such that in a criminal case it is sufficient if the proofs establish that a defendant is guilty beyond a reasonable doubt, not beyond all possible doubt.

30

Reasonable doubt is an honest and reasonable uncertainty existing in your mind as to the guilt of the defendant after carefully considering all the evidence. A reasonable doubt may be said to exist in any case when after a careful consideration of all of the evidence the jury would be unwilling to rely upon that evidence unhesitatingly in a matter of importance in its own affairs.

App. at 800-02.

The majority's decision to reverse Hernandez's conviction thus rests on its conclusion that the remarks made by the District Court on the second occasion, February 9, immediately after the jury was sworn and before the opening statements, which the majority characterizes as "the initial instructions," were such flagrant error as to mislead the jury and be incurable.

These remarks are quoted in full in the majority's opinion. What are the majority's objections?

The majority focuses on the statement made by the District Court, after it advised the jury that there is no specific definition of reasonable doubt (a patently accurate comment), that "[i]t's what you in your own heart and your own soul and your own spirit and your own judgment determine is proof beyond a reasonable doubt." App. at 175. The majority has two objections: this statement "allows each juror to judge the evidence by a visceral standard unique to that juror, rather than an objective heightened standard of proof applicable to each juror," Majority Opinion at 20, and it "allows jurors to convict based upon their individual gut feeling.' " Id. The majority fails to acknowledge that in those remarks, which were really comments rather than instructions, the District Court emphasized, at the outset of even that initial stage, that "[t]he burden of proof is on the Government. The Government brings the charges. The Government has to prove the charges." App. at 175 (emphasis added). Nor does the majority specify what the jurors were told that might lead them to look to their "gut feelings" rather than the evidence to which the District Court repeatedly referred.

31

If the majority's objection to the language used by the District Court is that it improperly suggests a subjective approach, then the majority is inconsistent with the Supreme Court's articulation of the concept of reasonable doubt as a "subjective state of near certitude," Jackson v. Virginia, 443 U.S. 307, 315 (1979) (emphasis added); see In re Winship, 397 U.S. 358, 364 (1970).

The majority's objection to the District Court's"initial instructions" takes those comments out of context. It gives short shrift to the government's argument that these comments were merely meant to give an overview of the trial procedure. An examination of the court's entire presentation at that time reveals that the court was providing precisely that overview. See generally  Federal Judicial Center, Benchbook for U.S. District Court Judges 95 (4th ed. 1996) (Preliminary jury instructions "are intended to give the jury, briefly and in understandable language, information to make the trial more meaningful."). The District Court began by explaining the jury's function and role, that witnesses will be called, that there will be interpreters, who the lawyers will be, that the burden of proof is on the Government, the sequence of events, where the jurors could lunch, and the courtroom procedures to be followed. The comment to which the majority objects is one sentence in an overview that covers eight pages. App. at 172-79.

The District Court emphasized the preliminary nature of those comments, stating on several occasions that the charge and the instructions would be given to the jury at a later time. Immediately after the language on which the majority focuses, the District Court expressly told the jurors that it would give them "some definitions at the end of the trial when I give the Judge's charge to the jury." App. at 175. Shortly thereafter, the court, continuing its explanation of the sequence of events that would follow, stated that after the lawyer on each side makes a closing argument, "the Judge gives the Judge's charge to the jury. When I do that, I'll give you something written so you can read along with me. That's when I'll define proof beyond a reasonable doubt. I'll define the presumption of innocence, what does that mean. I'll define robbery. I'll define the

32

various terms that you are hearing throughout the trial." App. at 176 (emphasis added). The court's procedure was consistent with common practice, under which the formal instructions containing precise definitions are left for the end of trial, following a formal charge conference.

There is no reason to assume that the jurors were unaware that the formal instructions and definitions, including that for reasonable doubt, would be given later in light of the District Court's clear statements to that effect. Just as we assume that jurors follow the accurate, formal instructions of the court, see Opper v. United States, 348 U.S. 84, 94 (1954) ("To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict. Our theory of trial relies upon the ability of a jury to follow instructions."); United States v. Newby, 11 F.3d 1143, 1147 (3d Cir. 1993) (jury presumed to follow curative instructions regarding stricken evidence absent "overwhelming probability" jury was unable to follow it), we should assume that the jurors here listened to the judge's preliminary instructions regarding when and how they would receive their formal ones.

Even were this not enough to show that there was no prejudicial error from the court's overview at the beginning of the trial, this conclusion is reinforced by the District Court's clarification of the import of the earlier language as soon as counsel objected. At sidebar, defense counsel stated:

>  I'm also objecting to the Court's lack of definition of burden of proof as far as reasonable doubt is concerned as something you feel inside which suggests they can go with some sort of a gut or bias or prejudice or some feeling about the case, while beyond a reasonable doubt is the highest burden we have in our system of justice.

App. at 182.

Contrary to the majority's suggestion that what it regards as the infirm instruction was not corrected, but merely contradicted by the final charge, the District Court took

33

steps almost immediately in response to counsel's objection. After reviewing the indictment with the jury, the court stated as follows

> Now, I have told you proof beyond a reasonable doubt will be defined in my charge, just as I will explain at greater length presumption of innocence. Because I refer to the fact that proof beyond a reasonable doubt has no accurate measuring rod, I don't want you to think that it is so ephemeral that it's meaningless or so subjective that it's an unworthy concept. It is a very important concept. It's indeed the backbone of the criminal law that proof must be convincing to a jury as to the guilt of a defendant beyond a reasonable doubt. And you will have to analyze the proofs so as to decide in your own mind: Was this proven beyond a reasonable doubt?

App. at 191.

In light of the prompt correction to the remarks that the majority finds objectionable, the court's emphasis to the jury that the instruction on reasonable doubt would be given later (and in writing), and the majority's acknowledgment that the final instructions on reasonable doubt were not objectionable, I believe that there is no reasonable likelihood that the jurors were misled to use an improper definition of reasonable doubt in finding Hernandez guilty.

I believe the majority's reversal of a conviction based on its view that the court's preliminary remarks were incurable is out of step with the precedent. Underlying our jurisprudence is recognition that error will occasionally be made, even error of constitutional magnitude, but that most error either can be cured through an instruction or has not prejudiced a defendant's right so substantially that the conviction must be reversed. See generally Donnelly v. DeChristoforo, 416 U.S. 637, 644 (1974) ("Although some occurrences at trial may be too clearly prejudicial for . . . a curative instruction to mitigate their effect, the [prosecutor's comment that defendant hoped to be convicted of a lesser charge] is hardly of such character."); United States v. Zehrbach, 47 F.3d 1252, 1265 (3d Cir.

34

1995) (en banc) ("In determining prejudice, we consider the scope of the objectionable [prosecutorial] comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction."); Newby, 11 F.3d at 1146 ("[W]e presume that the jury will follow a curative instruction [regarding stricken evidence] unless there is an `overwhelming probability' that the jury will be unable to follow it and a strong likelihood that the affect of the evidence would be `devastating' to the defendant." [citations omitted]); United States v. Menichino, 497 F.2d 935, 945 (5th Cir. 1974) ("[A]ny harm done by the [mid-trial] charge was vitiated by the later proper and curative instructions."). To evaluate a claimed error in a jury instruction, as in this case, an appellate court must look to the charge as a whole. See Victor v. Nebraska, 511 U.S. 1, 5 (1994).

There was extensive analysis of two reasonable doubt instructions by the Supreme Court in Victor, where the petitioners challenged their reasonable doubt instructions. In one case, the petitioner challenged the charge that defined reasonable doubt in terms of "moral evidence" and "moral certainty," but the Court, although not condoning use of those terms, nevertheless concluded that they neither suggested a standard of proof lower than required by due process nor allowed conviction on factors extraneous to the government's proof. Id. at 16. In the other case, the Court held that the instruction that a reasonable doubt is "not a mere possible doubt" also did not require reversal because other language in the instruction made clear the meaning of that instruction. Similarly, the Court, while agreeing that the trial court's equating of a reasonable doubt with a "substantial doubt" was problematic, nonetheless concluded that "taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury." Id. at 22.

It is significant that Justice O'Connor, speaking for the Court in Victor, pointed out that "in only one case have we held that a definition of reasonable doubt violated the Due Process Clause." Id. at 5. In the case to which she referred, Cage v. Louisiana, 498 U.S. 39 (1990) (per curiam), the

35

Court held that an instruction defining a reasonable doubt to be "an actual substantial doubt" was fatally defective because it suggested a higher degree of doubt than is required for acquittal under the reasonable doubt standard. Id. at 41. Certainly, the alleged error here in the court's preliminary, overview remarks is in no way equivalent with that in Cage, particularly as the error, if any, was followed by a prompt cure and, ultimately, a fully correct charge.

The majority suggests that the decision in Francis v. Franklin, 471 U.S. 307 (1985), may be analogous to this case. Not so. The instructions in Franklin were not defective because of the reasonable doubt portion of the charge but because the instruction on intent effected a mandatory presumption in violation of the Fourteenth Amendment's requirement that the state prove every element of a criminal offense.

In fact, in Holland v. United States, 348 U.S. 121 (1954), the Court, in considering the petitioner's challenge to a reasonable doubt charge in a federal criminal trial, agreed that there were problems with the charge, which"should have been in terms of the kind of doubt that would make a person hesitate to act . . . rather than the kind on which he would be willing to act. . . ," but nevertheless declined to reverse, noting "the instruction as given was not of the type that could mislead the jury into finding no reasonable doubt when in fact there was some." Id. at 140.

Similarly, in this case, I see no basis to conclude that the court's initial comments to the jury in an overview of the procedure that was to take place could have misled the jury. Although the court may not have adopted the most felicitous expression in its overview, both the curative instruction and the final charge were correct. The District Court's final jury instructions emphasized that"[a] defendant is never to be convicted on mere suspicion or conjecture"; "[r]easonable doubt is not vague or hypothetical doubt"; "[i]t is not speculative, imaginary qualms or misgivings." App. at 801. Those final instructions correctly conveyed the meaning of reasonable doubt and adequately neutralized whatever misleading effect may have been caused by the "what you feel inside" language in the remarks some four days earlier.

36

Our zealousness to insure that a defendant has had a fair trial and that justice has been done does not mean that every error, although corrected, must lead to reversal. In this case, I disagree with my colleagues that a small portion of the trial court's initial comments, which were promptly corrected and later neutralized by the final charge, requires reversal of Hernandez's conviction. I therefore respectfully dissent.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

37